[S. F. No. 6958.   Department Two.—July 27, 1916.]

## HARRY F. FISCHER et al., Respondents, v. F. W. CAREY et al., Appellants.

ACTION BETWEEN SHIP OWNERS — DISSATISFACTION WITH MANAGE-MENT — APPOINTMENT OF RECEIVER — SUPERIOR COURT WITHOUT JURISDICTION.—In an action in equity brought in the superior court by the owners of the minority interest in a ship against the owners of the majority interest for an accounting, the appointment of a receiver, and for an order decreeing the sale of the vessel and a ratable division of the proceeds, based upon differences existing between them as to the proper management of the ship, the court has no jurisdiction to appoint a receiver to take possession of the vessel for the purpose of operating and selling it, as the jurisdic-tion of the courts of the United States in admiralty is full and complete, under such circumstances; the state court is entitled, however, to retain jurisdiction of the action in so far as it addresses itself to the equitable consideration of settling accounts.

ID.—CONTROVERSIES BETWEEN SHIP OWNERS—JURISDICTION—CONSTRUC-TION OF SECTION 964, CIVIL CODE.—The provision of section 964 of the Civil Code that if a ship belongs to several persons not partners and they differ as to its use or repair, the controversy may be de-termined by any court of competent jurisdiction, is applicable to such cases as do not encroach upon admiralty jurisdiction.

ID.—SHIP OWNERS—STATUS OF.—Part owners of ships are not partners merely by virtue of their ownership, but are tenants in common, and in order to constitute the relationship of partners a special contract is required.

APPEAL from an order of the Superior Court of the City and County of San Francisco appointing a receiver.   John J. Van Nostrand, Judge.

The facts are stated in the opinion of the court.

Wm. M. Madden, for Appellants.

H. W. Hutton, for Respondents.

HENSHAW, J.—Plaintiffs, minority owners of the schooner Hugh Hogan, began this action in equity in the su-perior court of the state. The defendants are the owners of a majority interest in the schooner. The difference between the owners arises out of that situation so frequently presented

to an admiralty court where the minority owners are dissatisfied with the employment by the majority owners of the vessel. It is charged that the vessel is being operated at an undue expense, is taken into shallow harbors which she cannot enter or leave with her full load, and is subjected to the danger of becoming a total loss if allowed to continue on these voyages. It is further charged that she is being operated in the interest of the defendant Oregon and California Lumber Corporation and the Hurd Lumber and Navigation Company, and employed in the carrying of lumber cargoes from coast points to San Francisco. The plaintiffs prayed for an accounting, for the appointment of a receiver, and for an order decreeing the sale of the vessel and a division of the proceeds ratably amongst the part owners. The court appointed a receiver to take possession of the schooner and "to operate said vessel if it appears in the judgment of said receiver such operation can be done at a profit, and to preserve the said vessel, her earnings and appurtenances until the further order of the court." From this order certain of the defendants have appealed. The appellants urge that plaintiffs' action is cognizable in admiralty in the district court of the United States alone, and that the state court is wholly without jurisdiction to proceed in the matter.

The respondents, in support of the jurisdiction of the state court, announce the unquestioned principle that the adjustment of partnership matters and accounts is in equity alone and not in the admiralty court. They next declare that these parties plaintiff and defendant are partners. But this is not the fact. No partnership is averred in the pleading. The relationship of partners does not arise between part owners of ships merely by virtue of their ownership. It arises only by special contract. As part owners they are tenants in common in the ship and not partners. (Freeman on Cotenancy, sec. 379; *The New Orleans*, 106 U. S. 13, [27 L. Ed. 96, 1 Sup. Ct. Rep. 90].) In *Hendy* v. *March*, 75 Cal. 569, [17 Pac. 702], relied upon by respondents as establishing a partnership in this case, this court said: "Here is a distinct agreement to share in the profits and loss arising from the use of the vessel, and such an agreement constitutes a partnership. It is not necessary to say that the partnership extended to the ship itself as contradistinguished from its use. 'Part owners of a ship do not, by simply using it in a joint enterprise, become

partners as to the ship.' (Civ. Code, sec. 2396.)'' And in this case it is made to appear by the pleadings that so far from being partners the plaintiffs, objecting in a court of admiralty to the use which the majority owners were making of the ship, compelled them to give a bond for the safe return of the ship upon each voyage thereof. By virtue of these proceedings and of this bond the plaintiffs relieved themselves from liability for loss upon the voyage and at the same time deprived themselves of the right to share in the ship's profit—a situation absolutely repugnant to any conception of a partnership. (*Coyne* v. *Caples,* 8 Fed. 638; Freeman on Cotenancy, 2d ed., sec. 390.)

The question presented, therefore, is whether minority owners, under the indicated circumstances, may resort to the state courts for the appointment of a receiver who takes the control of a ship away from the majority owners for the purpose of operating and selling it. Respondents base their right to maintain this action upon a section of our code and upon certain state adjudications. Section 964 of our Civil Code declares that ''If a ship belongs to several persons, not partners, and they differ as to its use or repair, the controversy may be determined by any court of competent jurisdiction.'' Conceding that this language is comprehensive enough to embrace within it the action here brought, neither this nor any other state statute can have the effect of diminishing the admiralty jurisdiction of the federal courts. (*Aurora Shipping Co.* v. *Boyce,* 191 Fed. 960, [112 C. C. A. 372]; *The J. E. Rumbell,* 148 U. S. 1, [37 L. Ed. 345, 13 Sup. Ct. Rep. 498]; *Steamboat Orleans* v. *Phoebus,* 11 Pet. 175, [9 L. Ed. 677].) Our code section, therefore, will of necessity be held to apply to such cases as do not encroach upon admiralty jurisdiction, for as will hereinafter appear this is not a case within the saving clause of the Federal Judiciary Act. Have the admiralty courts any jurisdiction at all over this controversy? If they have, is their jurisdiction exclusive, or concurrent merely with that of the state? One phase may be spoken of only to be eliminated. An action for an accounting, as such, is, of course, equitable, and jurisdiction over it is in the state courts. Admiralty has and takes no jurisdiction over such actions. The utmost limit to which it goes is that where a sale of the ship has been had under decree it will take an accounting as a necessary incident for the purpose of making

a just distribution of the proceeds of the sale. But manifestly the accounting in this case is incidental to the principal relief sought. That relief is the taking over by a state court in equity, acting through its receiver, of the *rem* and a sale of that *rem* at the instance of the minority owners, who, disagreeing with the majority owners over the latter's management of the ship, plead a loss of the earning capacity of the ship, a depreciation of the value of their shares, and ask a sale of the vessel in consequence.

It is from this latter aspect that this case should be and will be treated. It is now well settled that the jurisdictional power of the district courts over "all cases of admiralty and maritime jurisdiction" (Const. U. S., art. III, sec. 2) is not limited to admiralty jurisdiction as it existed in England where it was in bitter conflict with the common law, but that reference may be had to all codes of maritime law, to all the decisions of the Mediterranean consular courts, and to the customs and practices of all civilized maritime countries. (*De Lovio* v. *Boit et al.*, 2 Gall. 398, [Fed. Cas. No. 3776].) Touching the reservation to suitors of "a common-law remedy where the common law is competent to give it" as provided in the Federal Judiciary Act, Benedict says: "The Judiciary Act, which established the United States Courts and defined their jurisdiction, confirmed the existing right of the common-law courts, by providing that the Federal District Courts shall have exclusive jurisdiction of 'all cases of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it.' The common-law remedy here mentioned is the right of a plaintiff to proceed *in personam* against a defendant, which remedy the common law is competent to give. Therefore, when a direct suit against a shipowner is brought, e. g., to recover seamen's wages, or damages for collision, and jurisdiction of the person of the defendant can be secured, such a suit may be brought either in admiralty or at common law, the two courts having in this respect concurrent jurisdiction. But the right to proceed *in rem* is distinctly an admiralty remedy, and hence exclusively within the control of the United States Courts; no state can confer jurisdiction upon its courts to proceed *in rem*. Nor could Congress give such power to a state, since it would be contrary to the Federal grant in the Constitution. So liens given by the laws of a state for mat-

ters which are subjects of admiralty jurisdiction are enforceable against the thing only in the Federal Courts; though the debt on which the lien is founded may be sued on *in personam* in the State Court. This right to proceed *in rem,* according to the methods of the maritime law, is the 'exclusive' jurisdiction of all civil causes of admiralty and maritime jurisdiction conferred upon the District Courts by section 563 of the Revised Statutes, subdivision eight.''

The foregoing, sufficiently for our purposes, outlines the principle which we conceive must govern this determination. To say when and under what circumstances a vessel shall be sold, is certainly a part of the civil law of licitation, which law forms to so great an extent the foundation of admiralty jurisdiction that it is so declared in the laws of Oleron, to which courts of admiralty make so frequent reference. Thus, the third provision of those laws is, ''Touching the engaging (sale or hypothecating) of ships or goods in case of necessity.''

And Benedict, in his learned work, after discussing the principles governing admiralty jurisdiction in the matter of disputes between part owners, declares: ''Cases of licitation or sale for the purpose of partition are also within the power of the American Admiralty, as they are of the European Maritime Court.'' (Benedict's Admiralty Practice, sec. 187.) Hughes, however (Hughes on Admiralty, sec. 158), announces: ''Although Admiralty does not have judisdiction to decree a sale of a vessel for mere purpose of partition, where the interests in the vessel are unequal, for in that case the majority can rule, yet if the interests are equal and the equal interests disagree . . . admiralty has jurisdiction to decree a sale of the vessel.'' Also it is said that in certain instances, not necessary here to specify, admiralty may order a sale of the vessel at the instance of the majority owners. In the phraseology of this quotation from Hughes is found the difficulty attending this consideration. Is it true that admiralty does not have *jurisdiction* to decree a sale at the instance of the minority owners, or is it that, having jurisdiction, it will not, by reason of the dominance of the principle that the majority owners have the right to the use and control of the vessel, decree a sale at the instance of the minority owners? As this question is answered so must go the decision of this case. For if it be true that admiralty has not this jurisdiction in the true sense and meaning of the word, then manifestly the state court is not trespass-

ing upon any of the reserved federal admiralty and maritime powers. But, if, upon the other hand, the true holding is, as above indicated, that admiralty has the jurisdiction and power, but for reasons sufficient unto itself will not exercise that power in favor of the minority owners, then the matter still remains one exclusively of federal cognizance, and the effort of the plaintiffs in this case is to accomplish in the state courts the doing of that which admiralty, with jurisdiction over the matter, would refuse to do. The manifest effect of this, then, would be an encroachment upon and a usurpation of the legitimate powers of the district courts in admiralty.

The respondents take the view first outlined, and they support it, as has been said, with decisions from state courts and with language found in some of the federal decisions. Thus the learned Justice Story, in *Steamboat Orleans* v. *Phoebus,* 11 Pet. 175, [9 L. Ed. 677], is relied on. He speaks in the following language: "The jurisdiction of courts of admiralty in cases of part owners having unequal interests and shares is not, and never has been, applied to direct a sale upon any dispute between them as to the trade and navigation of a ship engaged in maritime voyages. The majority of the owners have a right to employ the ship in such voyages as they may please, giving a stipulation to the dissenting owners for the safe return of the ship." So, also, in the *Ocean Belle Case,* [Fed. Cas. No. 10,402], 6 Ben. 253. In an action in the federal district court it is declared: "The court has no power to order a sale of this vessel on the facts stated in the libel to pay the debts and distribute the residue of the proceeds on the demand of the owners of five-sixteenths of her and against the will of the owners of the rest. . . . Such power of sale has never been established in this country." And so in the well-considered case of *The Seneca,* 3 Wall. Jr. 395, [Fed. Cas. No. 12,670], where the dispute was between two equal owners, the exercise of the powers in admiralty was reviewed, and it is declared that "If the majority owners refuse to employ the vessel, though they cannot be compelled to it by the minority, neither can their refusal keep the vessel idle to the injury of the minority or to the public detriment; and since in such a case the minority can neither employ her themselves nor force the majority to do so, the vessel may be valued and sold." And, finally, in *Tunno* v. *Betsina,* Fed. Cas. No. 14,236, [24 Fed. Cas. 316], after a lengthy and learned dis-

cussion of the rights of majority owners to employ the vessel against the wish of the minority owners, and the circumstances and conditions under which admiralty will decree a sale, and in declaring finally that it will not decree a sale at the instance of minority owners dissatisfied merely with the use, the learned circuit judge uses this language: "If not within the jurisdiction of the admiralty, a court of equity will be found adequate to the occasion, proper for the exercise of its authority. I consider that the power to sell, as exercised by Judge Washington, in the case of *The Seneca, supra,* was carried as far as the best authorities in the maritime law will warrant. Nor is it easy to comprehend for what useful purpose the power could be exercised in any other cases than such as I have referred to, in which a disagreement between part owners cannot be determined by the operation of principles applicable to associated ownership, or such as are specially provided for an ownership in vessels. Of what use would be the principle which affirms the control resulting to a majority from the fact of its being so, if in any case in which it was to be applied, a court would be asked to decree a sale? It would soon be that the only mode for preventing a dissolution, would be for the majority to render unquestioning accord to the wishes of the minority; no matter how small that minority, or unreasonable its exactions. In this case, the libellant is not the owner of a half of the vessel. He represents a minority in value. And the examination now made satisfies me that he is not entitled to a decree for a sale on the ground of disagreement with the other part owners as to the best mode of employing the vessel owned by them in common."

The interpretation put by certain of the state courts upon these cases, which interpretation is of course relied upon by respondents here, is that the admiralty court is without jurisdiction,—in other words, that it has no power to decree a sale at the instance of the disaffected minority owners. Yet in every one of these federal cases it is to be noted that the court entertains jurisdiction of the subject matter of the action, and, regardless of the language employed, the judgments in each case were judgments upon the merits, denying the particular remedy sought. And it must at once strike one as strange, if the courts of admiralty did not possess jurisdiction to do the thing which was sought, that they would not promptly have sent the cases out of court upon that specific

ground. The fact that in every instance the district court did retain the cases, did hear them, and did decide on the merits, against the positions of the minority owners, is most persuasive to the effect that by their language those judges did not mean to say that their courts had no jurisdiction, but that having jurisdiction they would not exercise it to grant the remedy or relief prayed for.

Certain of the state courts, as has been said, have taken the contrary view, and it is proper now to consider those decisions. *Andrews* v. *Betts,* 15 N. Y. Sup. Ct. Rep. (8 Hun) 322, was an action very similar to the one at bar. The vessel was owned in unequal proportions by different persons. They could not agree upon a sale, or upon the employment of it. One of these minority owners brought his action in equity to procure the appointment of a receiver, a sale of the vessel, and a division of the proceeds of the sale in proportion to the respective ownerships. The supreme court of New York entertained the action first, upon the ground that admiralty had no jurisdiction to act in such a case at the instance of a minority owner, and Boardman, J., delivering the opinion of the court, said: "I can see no reason why admiralty courts ought not to possess and exercise jurisdiction to order a sale in case of disagreement between owners, irrespective of their shares. Such a power, exercised in the discretion of the court, could scarcely fail to subserve the interests of the well disposed owners, and defeat the malice or stupidity of the evil disposed owners." For a second ground the court took the view that even though admiralty had jurisdiction, there was still concurrent jurisdiction in the state court, owing to the saving clause of the Judiciary Act (U. S. Revenue Laws, sec. 563, subd. 8), which saves "to suitors in all cases the right of a common-law remedy where the common law is competent to give it." Benedict, in the passage from his learned work on Admiralty above quoted, with the support of numerous federal decisions, points out that this reservation is, as it expresses, a saving of a right to a common-law remedy, and in especial the saving clause has reference to the common-law remedies in actions *in personam* as distinct from admiralty procedure, where, in so many instances, the vessel itself is personified and libel brought against it, without regard to its ownership, and therein he further points out that no state can confer jurisdiction upon its courts to proceed *in rem,*

nor to enforce in the state courts any liens which come within admiralty jurisdiction. Of course, the New York action, no more than this sought to exercise a common-law remedy. To the contrary, the common law afforded no relief to tenants in common in disputes and disagreements such as here presented. This is most lucidly pointed out by Mr. Freeman (Cotenancy, 2d ed., sec. 389 et seq.), where, after discussing the refusal of the common law to aid tenants in common in their efforts to recover possession or to partition chattels, he declares, speaking now of the distinction between chattels in ordinary and ships, "They (ship owners) may disagree either in reference to what employment is most advantageous, or in reference to the advisability of seeking any employment whatever. In either case, the law has provided remedies calculated to preserve the rights and promote the interests of all the owners, and also to minister to the general interests and promote the general welfare of the public. These remedies are not, however, to be found in the courts of the common law, nor in the tribunals charged with the administration of the principles of equity jurisprudence. (Parsons on Partnership, 558; *Castelli* v. *Cook*, 7 Hare, 89.) They must be sought in the courts of admiralty." Hence, if this view be correct, a court of equity, though competent, is not empowered to give relief when such a disagreement amongst the owners shall arise, since essentially the proceeding is *in rem*, and so invades the reserved admiralty jurisdiction over the vessel. Such an equitable remedy is not amongst those which are saved to suitors by virtue of the Federal Judiciary Act. Indeed, it is well understood why this is so, since the controversy was wholly between the judges of the common law courts and of the admiralty courts, and took the form of a very active effort upon the part of the latter to destroy entirely by the writ of prohibition the jurisdiction of the admiralty courts. Nor, as the learned expound, was this done out of any jealous regard for the rights of the people, nor for the superiority of the common-law system over admiralty jurisprudence, which latter was based upon the more liberal doctrines of the civil law. But it did have its origin and it owed its existence to a very much more unworthy motive, which was the desire of the common-law judges to increase the emoluments of their offices by fees, fines, and forfeitures, which were withheld from them under the admiralty jurisdiction. Therefore we must con-

clude, so far as the New York case is concerned, that if sound at all it is sound as being based upon the proposition that the district courts in admiralty are without jurisdiction of such a controversy. The next case is *Swain* v. *Knapp*, 32 Minn. 429, [21 N. W. 414], where the owner of one-third of a steamboat sued in the state court for an accounting, being apprehensive of loss from the nature of the majority owners' use of the boat, and in his accounting sought a receiver and a sale of the vessel. There the court fairly faced and fairly decided the question whether or not the remedy sought was one of the reserved common-law remedies, saying: "The defendant is unquestionably right in his position that this saving is of a common-law remedy, and not merely of a remedy in a common-law court (*The Moses Taylor*, 4 Wall. 411, [18 L. Ed. 397]; Spear, Fed. Jud. 81), and that the remedies sought in this action are not common-law remedies." But it reasoned to its satisfaction that since "the remedies sought in this action are not afforded in admiralty, then the subject matter of the action is not within admiralty jurisdiction." The third of these cases is *Reynolds* v. *Nielson*, 116 Wis. 483, [96 Am. St. Rep. 1000, 93 N. W. 455]. That case rests for its authority upon *Andrews* v. *Betts*, 15 N. Y. Sup. Ct. Rep. (8 Hun) 322, which has here been considered, and upon the text of Knapp on Partition, page 491. That author, conceding that "proceedings for partition of personal property are unknown at common law," proceeds to say that it is doubtful whether admiralty courts can exercise jurisdiction to decree a sale in a case where a vessel is owned in unequal proportions by several persons, but "if the admiralty courts have such jurisdiction in cases where there are unequal interests, it is not an exclusive jurisdiction to that court, but concurrent with that of the common-law courts. The court of equity has jurisdiction over an action, brought to secure a partition of personal property between tenants in common thereof. It matters not whether such property is a vessel to be used, upon the high sea, or other personal property, so long as there is a cotenancy, and a failure to agree upon the part of the cotenants, a court of equity has jurisdiction over the partition of the property, or a sale thereof and a division of the proceeds." This learned author bases his text upon the cases of *Andrew* v. *Betts, supra,* and *Smith* v. *Smith,* 4 Rand. (Va.) 95, the latter being simply a case of partition in equity between tenants in common own-

ing negro slaves; and *Tripp* v. *Riley,* 15 Barb. (N. Y.) 333,
where partition in equity was decreed in the case of grain
owned by tenants in common, and *Forbes* v. *Shattuck,* 22
Barb. (N. Y.) 568, which was a case of identical nature touch-
ing the partition of grain.  But of course upon such a ques-
tion the weight to be given to the text is no more than is jus-
tified by the decisions cited in its support, and it is manifest
that these decisions (excepting the first) have not the slightest
bearing upon the particular question here before us.  For the
reasons pointed out the state decisions are far from being satis-
factory, much less determinative.  Nor, so far as investiga-
tion goes, are those cases elsewhere given any force as author-
ity.  Indeed, we may find in the early volumes of our own re-
ports a declaration equally unsatisfactory and unsound, to the
effect that "The judicial power of the courts of the United
States in admiralty and maritime cases is not exclusive, and
the states have the power to confer that jurisdiction to its
fullest extent upon their own courts." (*Taylor* v. *Steamer
Columbia,* 5 Cal. 268.)  *The Alcalde,* 132 Fed. 577, is the
only other federal case which respondents call to their aid
upon this proposition.  In that case differences had arisen
between the owners, and an action was brought in the state
court and a receiver was appointed.  Another phase of the
litigation was brought in the district court in admiralty—a
libel *in rem* for money advanced.  Incidentally there arose a
consideration of the action of the state court, and upon this
the learned federal judge declared: "Whether the receiver had
legal authority to take the vessel out of the captain's custody
is a serious question which I will avoid by assuming that Cap-
tain White still continued to be the master."  We conclude,
therefore, that the reasoning of Professor Pomeroy is the most
satisfactory, and that reasoning is that while equity will in
general partition chattels when the chattel is a ship, this
direct action against the *rem* must be brought in admiralty
alone.

With this review we may return again to the main con-
sideration.  The jealousy of the English common-law courts
and their attacks upon the jurisdiction of the admiralty courts
have been referred to.  That jealousy took the form of deny-
ing to admiralty the power to decree any sale.  Thus in
*Ouston* v. *Hebden* (1745), 1 Wills, 101, Chief Justice Lee of
the court of kings bench, declared: "Indeed, the admiralty has
no jurisdiction to compel a sale, and if they should do that, you

might have a prohibition after sentence; or we may grant a prohibition against selling, or compelling the party to sell or to buy the shares of others.'' Here was an express denial by the common-law courts of this admiralty jurisdiction, accompanied by a threat of the use of prohibition, even in a case where it did not appear that admiralty proposed to order a sale. But, as has been said, the jurisdiction of the American courts in admiralty is not limited to the jurisdiction of the English admiralty courts, and even in England complete jurisdiction over the matter of sale has been conferred upon the admiralty court by 3 and 4 Victoria, chapter 65, section 4, and by the Admiralty Court Act of 1861, the jurisdiction of the court of admiralty being transferred to the High Court of Justice.

I take it to be unquestioned that our greatest authority upon American admiralty and maritime law is Justice Joseph Story, whose learned opinions when on the supreme bench of the United States did so much to elucidate, clarify, and settle the disputes. Upon this question he thus speaks, and his words are worthy of quotation *in extenso:* ''Malyne evidently supposes that the general maritime law authorizes a sale to be made by the proper court of admiralty in all cases, where, by reason of the disagreement of the partowners, the ship cannot be employed, whether there be an equality in the dissenting interests, or not. Molloy adopts the same opinion; and it has apparently the support of others of the old English maritime writers, as a generally recognized practical rule. The Consolato del Mare seems to uphold the doctrine, that, at least after the first voyage of a ship, which is owned by the master and other persons, the partowners may compel a sale of the ship, in case of a disagreement between them. The law of Scotland gives a right, as it should seem, in all cases to the dissenting partners, to offer their shares for sale to the other owners at a particular price; and, if this offer is not accepted, then to require a judicial sale to be made of the ship, and the proceeds to be divided among them.

''It has also been generally supposed, that, according to the common law of England, in no case whatsoever of a disagreement of the partowners, as to the employment of the ship upon any particular voyage, does there exist any jurisdiction in the Court of Admiralty (and, if that court has it not, no other court has), to order a sale thereof, whether the ship be owned in equal, or in unequal shares. It is true, that the terms of

the commissions, granted to the judges of that court, include jurisdiction of all matters, which concern owners and proprietors of ships, as such. But this jurisdiction of the courts of admiralty has been exercised for the last two centuries in England, if one may say so, *in vinculis,* in consequence of the severe penalties imposed upon the judges by statute, if they should happen unintentionally to exceed their true jurisdiction; and the open hostility and prohibitory interference of the courts of common law. The commissions have thus become practically much narrowed in the import of their terms by the construction of these latter courts. It was positively, although incidentally, asserted by Lord Chief Justice Lee, in a case in the King's Bench, in the Reign of George the Second, that the court of admiralty has no authority to compel a sale in any case of disagreement whatever between partowners. If this doctrine be in reality established in the common law of England, it is a reproach both to its equity and its justice; for it leaves the part owners of ships without any remedy whatsoever, in cases where irreparable injuries may arise from an inequality of division in interests and opinions, without any fault or wrong on either side. Upon what ground it has been asserted, it is difficult to perceive. It certainly has no support in the positive maritime law of other countries, or in the ancient principles of maritime jurisprudence. All these point the other way. The admiralty courts of England have never of themselves adopted any such limited doctrine; but have always contended for the exercise of the full jurisdiction as rightful, although they have been practically compelled to surrender it under the imposing authority of the court of common law. . . . The right to order a sale of property, subjected to its jurisdiction, is clearly a matter within the competency of a court of admiralty, and, indeed, is familiar in practice, in order to prevent irreparable mischiefs or impending losses. Analogy, therefore, is clearly in its favor; and unless some limitation or exception can be asserted to exist, either in the origin, or constitution, or practice of the court itself, it will not be a very satisfactory mode of disposing of the question, for a court of common law to assert upon its own mere *dictum,* without any reasoning in support of it, that the court of admiralty has a right, in cases of disputes between partowners of ships, to take a stipulation, but not to

order a sale. Such language would seem more like an edict than a judgment, and promulgate an arbitrary distinction, rather than a rational interpretation of the jurisdiction of another court.'' (Story on Partnership, p. 611 et seq.)

This concludes a review of the subject matter, necessarily hasty and imperfect, but from it it would seem that but one conclusion can be drawn, and that is that, unhampered by the restriction which the common-law courts placed upon English admiralty jurisdiction, the jurisdiction of the courts of the United States in admiralty is full and complete touching the matter of sale under the circumstances here indicated, that is to say, where dissentient owners are at strife over the use to be made of the ship; for it must, from the nature of admiralty jurisdiction, be a fundamental part of that jurisdiction to exercise control over the *rem*—the ship itself. Admiralty draws and may draw as well upon equitable principles as upon state statutes for the administration of its jurisdiction. But it does so only, we take it, though in this we may err [See *The Hamilton,* 207 U. S. 398, 52 L. Ed. 264, 28 Sup. Ct. Rep. 133], as those principles and statutes appeal to it, and not by force of any compulsion other than the authority vested in Congress to make laws upon the subject matter. Admiralty, then, has jurisdiction to decree a sale of a vessel under all circumstances like those here presented. If admiralty refuses to decree the sale it is not because of a lack of power so to do, but because the sale under the indicated circumstances would be contrary to another paramount principle of admiralty jurisdiction—the right of control in the majority. We have endeavored to be careful to limit this discussion to the facts of the case, and of course everything that has been said is in reference to those facts exclusively. No question here arises over the jurisdiction of equity, for example, to enforce a lien, a contract for sale, or to decree an accounting as such. But we hold that the power of a state court does not go to the length here exercised, of appointing a receiver and decreeing a sale because of the differences over the management of the vessel which have sprung up between the legal owners of that vessel. The state court is entitled to retain jurisdiction of the action in so far as it addresses itself to the equitable consideration of settling accounts. But further than that it may not go. If, however, we are mistaken in our conclusion, we are happy in the thought that now at length either suitor

may have this question determined with finality by the federal courts, where its determination properly belongs.

The order appointing a receiver is therefore reversed.

Lorigan, J., and Melvin, J., concurred.

Hearing in Bank denied.