95 N.Y.2d 583 (2000)
744 N.E.2d 114
721 N.Y.S.2d 579
WILLIE CAMMON, Respondent,
v.
CITY OF NEW YORK, Appellant, and ANJAC ENTERPRISES, INC., Defendant and Third-Party Plaintiff-Appellant.
MACRO ENTERPRISES, INC., Third-Party Defendant-Appellant.
Court of Appeals of the State of New York.
Argued October 12, 2000.
Decided December 21, 2000.
*584 Morris, Duffy, Alonso & Faley, L. L. P., New York City (Pauline E. Glaser and Yolanda L. Himmelberger of counsel), for appellant and defendant and third-party plaintiff-appellant.
William M. Kimball, New York City, James P. O'Connor and Gladys Carbuccia for third-party defendant-appellant.
*585 Cappiello Hofmann & Katz, P. C., New York City (Paul T. Hofmann of counsel), for respondent.
Chief Judge KAYE and Judges CIPARICK and WESLEY concur with Judge SMITH; Judge ROSENBLATT dissents in part and votes to modify in a separate opinion in which Judge LEVINE concurs.

OPINION OF THE COURT
SMITH, J.
The central issue here is whether Federal maritime law preempts New York Labor Law §§ 200, 240 (1) and § 241 (6).
Plaintiff Willie Cammon, a foreman dock builder, was injured while repairing a wood fender system[1] at the South Bronx Marine Transfer Station, also known as the Hunts Point Sanitation Department Transfer Station. New York City owns and operates the Marine Transfer Station and contracted with defendant Anjac Enterprises, Inc. to repair structures at the facility. Anjac subcontracted the pier repair to third-party defendant Macro Enterprises, Ltd., plaintiff's employer. Macro agreed "to perform all work * * * strictly in conformance and compliance with all laws, rules, regulations, ordinances and statutes in force in the locality in which the work is located."
*586 In order to repair the pier, plaintiff often worked from a float stage in navigable waters that was secured to the land-based transfer station. At the time of the accident, plaintiff was cutting timber from the bulkhead. While cutting, he had to reach above his head. Using a chain saw, he would cut a portion of the timber, attach the timber with a chain to a boom from a crane and then cut the remaining portion of the timber. The crane would then lift the timber and place it on a barge. Plaintiff had just cut a portion of the timber and attached the timber to the boom. He had not cut the remaining portion. A passing tugboat created turbulence that moved the crane bar and float stage. The timber, 12 inches by 12 inches by 12 feet and weighing 200 pounds, came loose from the bulkhead. While still attached to the boom, the timber swung about wildly, striking plaintiff first on the top of the head and then striking other parts of his body. As a construction worker "engaged in maritime employment" (33 USC § 902 [3]), plaintiff qualified and received compensation and medical benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA") (33 USC § 901 et seq.).
Plaintiff commenced this action in Supreme Court, alleging violations of State Labor Law §§ 200, 240 (1) and § 241 (6) against the City of New York and the general contractor, Anjac. Specifically, paragraph 16 of the complaint alleges:
"The injury to plaintiff was caused by the negligence of the defendant and by its breach of the various provisions of Labor Law §§ 200, 240 and 241 and other federal, state and local statutes, ordinances and regulations."
Anjac asserted a third-party complaint against plaintiff's employer Macro, seeking contribution and indemnification.
The City and Anjac moved for summary judgment dismissing the complaint upon the ground that Federal maritime law preempts New York Labor Law. In the alternative, defendants moved for summary judgment on their contractual and common-law indemnification claims against third-party defendant Macro. Plaintiff cross-moved for partial summary judgment on liability on his Labor Law § 240 (1) and § 241 (6) claims. Supreme Court granted defendants' motion for summary judgment to the extent of dismissing the complaint and denied plaintiff's cross motion.
The Appellate Division reversed and reinstated the complaint, holding that plaintiff's Labor Law causes of action were *587 not preempted by Federal maritime law. The Appellate Division subsequently granted the defendants and third-party defendant leave to appeal to this Court and certified the following question: "Was the order of this Court, which reversed the order of the Supreme Court, properly made?" We agree with the Appellate Division that, under the circumstances presented, plaintiff's Labor Law claims are not preempted.
Initially, the parties agree that there is admiralty subject matter jurisdiction over plaintiff's claims. The existence of admiralty jurisdiction, however, does not resolve the question of which substantive law to apply.
Defendants and third-party defendant (hereafter defendants) maintain that Federal maritime law should apply to the exclusion of plaintiff's Labor Law claims because maritime law does not generally impose liability without actual proof of negligence. New York State Labor Law § 240 (1), however, imposes strict liability upon an owner or contractor (see, Zimmer v Chemung County Performing Arts, 65 NY2d 513). Thus, defendants argue, to impose State liability standards where admiralty jurisdiction exists would disrupt the uniformity of Federal maritime law. In support, defendants rely on the First Department case, Tibak v City of New York (154 AD2d 313, lv denied 75 NY2d 705). In that case (unlike the present case), the First Department determined that the plaintiff's Labor Law claims were superseded by Federal admiralty law, and held that "the rights and liabilities of the parties under the general maritime law cannot be enlarged or impaired by State statute" (id., at 314). Defendants note that the Second Department has taken a similar view with respect to Labor Law § 240 in Eriksen v Long Is. Light. Co. (236 AD2d 439) and Rigopoulos v State of New York (236 AD2d 459).
In response, plaintiff argues that Federal maritime law does not preempt his Labor Law claims because there is no Federal law or interest directly impacted by their implementation. Consequently, plaintiff contends, uniformity of maritime law would not be affected by allowing State law claims here. Plaintiff also maintains that New York has an important interest in regulating safe construction practices within its borders and that there is a presumption against restricting exercise of its police powers to protect the health and safety of its citizens.
The fact that Federal maritime law is involved does not necessarily mean that State law is superseded. "The exercise of admiralty jurisdiction * * * `does not result in automatic *588 displacement of state law'" (Yamaha Motor Corp., U. S. A. v Calhoun, 516 US 199, 206). Thus, "Federal-court jurisdiction over such cases * * * has never been entirely exclusive" (American Dredging Co. v Miller, 510 US 443, 446). What is unclear is the extent to which State courts may apply their own law in maritime cases. In assessing whether the State rule is preempted, a number of factors may be considered, including whether the State rule conflicts with Federal law, hinders uniformity, makes substantive changes, or interferes with the characteristic features of maritime law or commerce (id., at 446, 447; Madruga v Superior Ct. of Cal., 346 US 556, 561; Southern Pac. Co. v Jensen, 244 US 205, 216).
Federal maritime law often encompasses State law (Yamaha Motor Corp., U. S. A. v Calhoun, 516 US 199, 206, supra). In Western Fuel Co. v Garcia (257 US 233), for example, the United States Supreme Court held that the widow of a maritime worker killed in California territorial waters could bring a wrongful death action in an admiralty court, reasoning that:
"The subject is maritime and local in character and the specified modification of or supplement to the rule applied in admiralty courts when following the common law, will not work material prejudice to the characteristic features of the general maritime law, nor interfere with the proper harmony and uniformity of that law in its international and interstate relations" (id., at 242).
Just a month later, in Grant Smith-Porter Ship Co. v Rohde (257 US 469), the Court applied the "maritime but local" rule where a carpenter's injury occurred in navigable waters. In concluding that State compensation law should apply, the Court stated that "as to certain local matters regulation of which would work no material prejudice to the general maritime law, the rules of the latter might be modified or supplemented by state statutes" (id., at 477). In subsequent cases, the Court has employed the "maritime but local" exception to allow the application of State law in other contexts (see, e.g., Askew v American Waterways Operators, 411 US 325 [regulation of sea-to-shore pollution]; Wilburn Boat Co. v Fireman's Fund Ins. Co., 348 US 310 [regulation of maritime insurance]).
Plaintiff's theory of liability arises under New York Labor Law § 240 (1) and § 241 (6). Given that protection of workers engaged in maritime activities is an objective of Federal maritime law (Yamaha v Calhoun, 516 US at 214-215, supra), this *589 case is unlikely to disrupt Federal maritime activity (Jerome B. Grubart, Inc. v Great Lakes Dredge & Dock Co., 513 US 527, 533-534). State application of strict liability here will not "unduly interfere[] with the federal interest in maintaining the free flow of maritime commerce" (American Dredging, 510 US at 458, supra [Souter, J., concurring]). Local regulations that do not affect vessel operations, but rather govern liability issues with respect to landowners and contractors within the State, have no extraterritorial effect.
Nor is the concept of strict liability necessarily antithetical to Federal maritime law. States may have important interests justifying the application of a strict liability statute. Most significantly, recognizing the importance of State police powers to protect the health and safety of its citizens in Askew v American Waterways (411 US 325, supra), the Supreme Court authorized application of a State strict liability statute notwithstanding the general admiralty principle prohibiting strict liability for negligence.
Strict liability causes of action exist for personal injury claims based upon violations of statutory duty (see, Kernan v American Dredging Co., 355 US 426 [employer held liable for death of seaman, without a showing of negligence, where death resulted from violation of Coast Guard regulations]). Similarly, strict liability is a part of Federal maritime products liability law (see, East Riv. S. S. Corp. v Transamerica Delaval, 476 US 858, 865-866). Likewise, maritime law permits recovery in strict liability when a shoreside contractor causes injury to a marine worker as a result of the contractor's breach of warranty (see, Chisholm v UHP Projects, 205 F3d 731, 734 [4th Cir 2000]). The doctrine of seaworthiness also provides an absolute and nondelegable duty to provide a seaworthy ship (see, Mitchell v Trawler Racer, 362 US 539, 549-550).[2] Finally, the Federal maritime workers' compensation statute, the LHWCA, is also a strict liability compensation plan where employers are liable to the injured employee irrespective of fault (see, Jones & Laughlin Steel Corp. v Pfeifer, 462 US 523, 528-529).
New York's Labor Law is a local regulation enacted to protect the health and safety of its workers. As the Appellate Division *590 properly concluded, application of the Labor Lawa local regulation governing liability of landowners and contractors acting within the State (see generally, Padula v Lilarn Props. Corp., 84 NY2d 519)will not unduly interfere with a fundamental characteristic of maritime law or unduly hamper maritime commerce. Indeed, many Labor Law provisions such as section 200 (1) and section 241 (6) allow for liability predicated on fault and are wholly consistent with the laudatory maritime goal of compensating injured maritime workers. Furthermore, under these circumstances, where the tort was maritime but local and there are no far-reaching implications for vessels, seafarers or entities engaged in maritime commercial transactions, there is no threat to the uniformity of Federal maritime law sufficient to displace application of an important State health and safety measure, even though it may impose strict liability (see, Gravatt v City of New York, 1998 WL 171491, *12, 1998 US Dist LEXIS 4886, *32 [SD NY] ["protecting workers employed in the state is within the historic police powers of the State and there is no `clear and manifest' congressional intent to preempt this state prerogative"]).
We conclude our analysis with the following observation. Choice of law in the admiralty context, generally, is not an easy inquiry. That is particularly true in this case: plaintiff was injured while on a floating raft on navigable waters, but at the same time the raft was anchored to a land-based transfer station, and the work at issue was repair to a land structure. In a case such as this, our decision to affirm is influenced by the Labor Law's strong State interest in protecting workers (see, e.g., Melber v 6333 Main St., 91 NY2d 759, 762; Zimmer v Chemung County Performing Arts, 65 NY2d 513, 520-521, supra). Because strict liability is not wholly at odds with Federal maritime principles, we see no reason for the Labor Law's provisions to be displaced in the context of this local land-based repair.
Finally, we underscore that we reach only the preemption issue, the only question decided by the Appellate Division, and we reach no other issue regarding the validity of plaintiff's claims under the Labor Law.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
ROSENBLATT, J. (dissenting in part). We concur with the majority insofar as it holds that maritime law does not preempt *591 Labor Law § 200 or § 241 (6). In our view, however, maritime law preempts Labor Law § 240 (1) and we therefore dissent in part.
As a threshold matter, admiralty jurisdiction exists in this case (see, Jerome B. Grubart, Inc. v Great Lakes Dredge & Dock Co., 513 US 527). Plaintiff was injured as he stood on a "float stage" in navigable waters. At the time of the accident, plaintiff was repairing a wood fender system on a pier extending over the East River. The City of New York owned the pier and used it in connection with its garbage transfer station. The fender system protected the pier from arriving and departing garbage barges. The cause of plaintiff's injury is traceable to a passing tugboat, which created a wake that disrupted a moored construction barge. Plaintiff was cutting a piece of timber from the fender system. A crane mounted to the construction barge secured the timber. When the tugboat's wake disrupted the barge, the crane dislodged the timber and, in the process, the timber struck plaintiff. Accordingly, both the construction work and the cause of the injury have a substantial connection to maritime activity.
The conflict between Labor Law § 240 (1) and maritime law could not be plainer: Under Labor Law § 240 (1), an injured worker's contributory negligence does not reduce a defendant's liability.[1] Under maritime law, it does.[2] The conflict is irreconcilable. And it is a matter of no small consequence, considering that these doctrines go to the very heart of liability and recovery, and directly implicate the harmonious administration of maritime law.

I.
The United States Supreme Court has explained that "admiralty has developed and now follows its own * * * more flexible rule which allows * * * consideration of contributory negligence in mitigation of damages as justice requires" (see, Pope & Talbot v Hawn, supra, 346 US, at 409; see also, The Max Morris v Curry, 137 US 1, 11 [tracing early concepts of comparative fault to a historic maritime concern for justice and equity]). Although the exercise of Federal admiralty jurisdiction *592 does not automatically displace State law, the Supremacy Clause requires preemption if the application of State law would make inroads on admiralty's goals of uniformity and harmony (see, Grubart, 513 US, at 546, supra).
As the majority has repeatedly emphasized, States have important interests that must be recognized in any preemption analysis. In keeping with the "savings to suitors" clause,[3] however, those interestsand we subscribe to their obvious importancemust be adjusted so they conform to an established, predictable body of maritime law. In the end, it is a matter of accommodation.
The Supreme Court has held that a State may "`adopt such remedies, and * * * attach to them such incidents, as it sees fit' so long as it does not attempt to make changes in the `substantive maritime law'" (Madruga v Superior Ct. of Cal., 346 US 556, 561, supra [quoting Red Cross Line v Atlantic Fruit Co., 264 US 109, 124]). The Supreme Court has also held that a defendant's liability must be measured under maritime principles instead of State law if the maritime principles implicate admiralty rights, as opposed to remedies (see, Chelentis v Luckenbach S. S. Co., 247 US 372, 384). Thus, in Pope & Talbot, the Supreme Court held that maritime comparative fault principles are "substantial admiralty rights" and therefore must prevail over a State's contributory negligence rule (346 US, at 409-410, supra). The case before us presents precisely the same issue: plaintiff is seeking to supplant substantive maritime principles with a conflicting State law. Madruga, Pope & Talbot and Chelentis simply do not permit it.
In American Dredging Co. v Miller (510 US 443), the United States Supreme Court applied a well established two-part test governing admiralty common-law preemption. A court must determine whether State law (i) works material prejudice to a characteristic feature of maritime law, or (ii) interferes with the harmony and uniformity of maritime law (see, American Dredging Co., 510 US, at 447, supra; see also, Romero v International Term. Operating Co., 358 US 354, 373; Southern Pac. Co. v Jensen, 244 US 205, 216). If either condition exists, maritime law must prevail (see, American Dredging Co., 510 *593 US, at 447, supra). Here, we submit, the test is satisfied in both instances.
Over the years, the Supreme Court has employed various formulations for identifying characteristic features of maritime law (see, e.g., Madruga, supra, 346 US, at 561; Pope & Talbot, supra, 346 US, at 409-410; Chelentis, supra, 247 US, at 384). More recently, the Supreme Court explained that a characteristic feature of maritime law is one that either originated in admiralty or has exclusive application in admiralty (see, American Dredging Co., supra, 510 US, at 449-450). Comparative fault is such a feature.
Although its origins are shrouded,[4] early English common law suggests that comparative fault first appeared in admiralty and medieval sea codes.[5] When comparative fault arrived on our shores, it was on the shoulders of English admiralty law. As Professor Keeton aptly observed, "[o]utside of admiralty, comparative negligence did not appear in American jurisprudence until the early twentieth century" (see, Prosser and Keeton, Torts § 67, at 471 [5th ed 1984]).
The United States Supreme Court's decisions in Pope & Talbot (346 US 406, supra) and Kermarec (358 US 625, supra) leave no doubt that comparative fault is a characteristic feature of maritime law. It is basic and fundamental to allocation of responsibility and thus lies at the heart of maritime jurisprudence. Indeed, other courts have recognized as much, concluding that the early comparative fault principle of "division of damages" is "deeply rooted in admiralty" and is therefore "an essential and characteristic feature of the substantive law of admiralty" (see, Intagliata v Shipowners & Merchants Towboat Co., 26 Cal 2d 365, 373, 159 P2d 1, 7 [1945]; see also, Scudero v Todd Shipyards Corp., 63 Wash 2d 46, 52-53, 385 P2d 551, 555 *594 [1963]; Eriksen v Long Is. Light. Co., 236 AD2d 439, 440). Of course, comparative fault has since expanded well beyond admiralty law, but the doctrine retains its deep roots in maritime jurisprudence. Given this background, we cannot resist the conclusion that comparative fault is a characteristic feature of maritime law.
Moreover, Labor Law § 240 (1) would materially prejudice the maritime doctrine of comparative fault. In a single cause of action, strict liability and comparative negligence cannot occupy the same ground. Applying strict liability would not only "materially prejudice" the comparative fault doctrine, it would eviscerate it. In this respect, Labor Law § 240 (1) differs from Labor Law §§ 200 and 241 (6). The latter create a statutory standard of care that would not otherwise exist in maritime law, but nevertheless do not invade maritime law's bedrock principles as to fault allocation. In our view, the first prong of American Dredging Co. is fully satisfied.
So is the second. Preemption is required under that prong if application of State law interferes with the "`proper harmony and uniformity'" of maritime law in its "`international and interstate relations'" (see, American Dredging Co., 510 US, at 447, supra [quoting Southern Pac. Co. v Jensen, 244 US, at 216, supra]). Here, it does. In Pope & Talbot (346 US, at 409-410, supra), the Supreme Court held that admiralty's comparative fault doctrine preempted application of a State contributory negligence rule. More recently, in Yamaha Motor Corp., U. S. A. v Calhoun (516 US 199, 210), the Supreme Court cited Pope & Talbot as an illustration of when the need for uniformity mandates preemption. Numerous other courts have concluded that the need for uniform application of comparative fault requires that maritime law preempt inconsistent State law (see, e.g., Miller v American President Lines, 989 F2d 1450, 1462; Hendricks v Transportation Servs. of St. John, 41 VI 21, 28 [Virgin Is]; see also, National Mar. Serv. v Petroleum Serv. Corp., 736 F2d 272, 277 [5th Cir]).
This all makes good sense. Considering that the desired goals are uniformity and harmony, it is difficult to see how these objectives can be unimpaired (or left with even a semblance of harmony) if the rules vary with the locale. One State may opt for strict liability, another for contributory negligence as a bar to recovery, another may interpose assumption of risk, while others would be free to fashion even more variants or different rules. The uniformity prong is important so that predictability will prevail over happenstance.
*595 In American Dredging Co. (510 US, at 453, supra), the Supreme Court concluded that application of a State forum non conveniens law would not unduly hamper maritime uniformity. It reached that conclusion having determined that forum non conveniens was "procedural rather than substantive" (id.). That distinction is key to the inquiry before us. Here, the strict liability rule that plaintiff would apply is undeniably substantive. Accordingly, application of strict liability would be at war with the holding in American Dredging Co.

II.
We disagree with the unpublished decision of the United States District Court in Gravatt v City of New York (1998 WL 171491, 1998 US Dist LEXIS 4886 [SD NY]). Gravatt is not binding on this Court, and we are not convinced by its reasoning. In that case, the court identified other instances in which strict liability appears in maritime law and laid considerable stress on the point. The issue, however, is not whether maritime law recognizes strict liability principles in other instances. Surely it does. But that is not relevant to the analysis at hand, because in our case, maritime law undisputedly calls for the application of comparative fault.
Grant Smith-Porter Ship Co. v Rohde (257 US 469) does not support plaintiff's position. Rohde was a fact specific case that is distinguishable from the one before us. The primary issue was whether a State workers' compensation statute could limit an employee's right to sue his employer for additional damages beyond the benefits provided under workers' compensation. The Supreme Court concluded that "the parties contracted with reference to the state statute; their rights and liabilities had no direct relation to navigation, and the application of the local law [could] not materially affect any rules of the sea whose uniformity is essential" (257 US, at 477, supra). Unlike Rohde, the cause of the accident and the nature of the construction work in the case before us both bear a direct relation to maritime activity. Indeed, plaintiff applied for and received benefits under the Longshore and Harbor Workers' Compensation Act. Nor does Askew v American Waterways Operators (411 US 325) avail plaintiff. In that case, the Supreme Court emphasized that Federal environmental laws specifically invited States to enact stricter statutes relating to pollution regulation (see, Askew, 411 US, at 329-337, supra).
None of the other cases upon which the majority relies involved the displacement of a maritime law feature as *596 fundamental as comparative fault (see, e.g., Yamaha Motor Corp., U. S. A. v Calhoun, 516 US 199, supra [State wrongful death statute given effect]; Western Fuel Co. v Garcia, 257 US 233, 242 [same]; American Dredging Co., 510 US 443, 452, supra [State forum non conveniens law given effect]; Wilburn Boat Co. v Fireman's Fund Ins. Co., 348 US 310 [State contract law principle given effect]). In each of these cases the Supreme Court merely concluded that application of State law would not violate its standards for maritime preemption.
Closer in point is State of Maryland Dept. of Natural Resources v Kellum (51 F3d 1220 [4th Cir]). There, the Court held that maritime comparative fault principles preempted a Maryland statute that "significantly changed the standard of care owed by the defendants from ordinary care, as equated with negligence, to that of strict liability" (51 F3d, at 1228, supra).
We would modify the order of the Appellate Division and hold that Federal admiralty law preempts Labor Law § 240 (1).
Order affirmed, etc.
NOTES
[1] A fender system is a series of pilings and wooden cross pieces within the pier at the water's edge, designed to protect the pier from impact of other vessels leaving and entering the pier.
[2] Seaworthiness is a strict liability doctrine applicable to seamen (see, Mahnich v Southern S. S. Co., 321 US 96). While the doctrine was extended to longshore workers in Seas Shipping Co. v Sieracki (328 US 85), Congress negated the extension in amending the Longshore and Harbor Workers' Compensation Act in 1972 (33 USC § 901 et seq.). (See, Pub L 92-576, 86 US Stat 1251.)
[1] See, Gordon v Eastern Ry. Supply, 82 NY2d 555, 562; Stolt v General Foods Corp., 81 NY2d 918, 920.
[2] See, United States v Reliable Transfer Co., 421 US 397, 405-406; Kermarec v Compagnie Generale Transatlantique, 358 US 625, 629; Pope & Talbot v Hawn, 346 US 406, 409-411.
[3] See, 28 USC § 1333 (1). The "savings to suitors" clause underlies a venerable doctrine, which has been with us since the beginnings of our Republic. It found early expression in the Judiciary Act of 1789 (§ 9, 1 US Stat 73, 76-77) and preserves the jurisdiction of State courts to entertain in personam maritime causes of action (see, Madruga v Superior Ct. of Cal., 346 US 556, 560-561).
[4] Scholars have found comparative fault principles as far back as the Digest of Justiniancompleted in 533 A.D. (see, Mole and Wilson, A Study of Comparative Negligence, 17 Cornell L Quarterly 333, 337 [1932]; see also, Leibman et al., The Effect of Lifting the Blindfold From Civil Juries Charged with Apportioning Damages in Modified Comparative Fault Cases: An Empirical Study of the Alternatives, 35 Am Bus LJ 349, 355-356 [1998]).
[5] See, Turk, Comparative Negligence on the March, 28 Chi-Kent L Rev 189, 220-225 [1950]; Mole and Wilson, supra, at 339 [considering that contributory negligence worked a complete bar to recovery, the courts of admiralty "early showed their displeasure over the practical working of the common-law rule * * * and, desiring to overcome the obvious hardships that arose from its application, formulated more just rules for determining who should bear the loss"]; see generally, Wood and Deere, Comparative Fault § 1:10, at 14, 19 [3d ed 1996].